UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Edward Baier, | ) | C/A No. 4:10-1599-MBS-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | )REPORT AND RECOMMENDATION | |
| | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of Social

Security, denying the Plaintiff's claim for Disability Insurance Benefits ("DIB").  The only issues

before the Court are whether the findings of fact are supported by substantial evidence and whether

proper legal standards have been applied.  This case was referred to the undersigned for a report and

recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I.  PROCEDURAL HISTORY

The Plaintiff, Edward Baier, filed an application for DIB on January 31, 2007, with an

alleged onset of disability of April 1, 2004.  (Tr. 44.)  The Plaintiff requested a hearing before an

administrative law judge ("ALJ") after his claims were denied initially and on reconsideration.  Id.

 The ALJ conducted a hearing on April 10, 2009, at which both the Plaintiff and a vocational expert

("VE") appeared and testified.   Id.

1

On July 17, 2009, the ALJ issued a decision finding that the Plaintiff was not disabled on or before December 31, 2004, the date he was last insured for purposes of DIB. (Tr. 44-59.) In deciding that the Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2004.
>
> 2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of April 1, 2004, through his date last insured of December 31, 2004 (20 CFR 404.1571 et seq.).
>
> 3. The claimant has the following severe combination of impairments: cardiomegaly, obesity, degenerative joint disease of the knees, right hemidiaphragm paralysis, and chronic obstructive pulmonary disease (COPD) (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the RFC to perform sedentary work as defined in 20 CFR 404.1567(b) except that he could never climb ropes/ladders/scaffolds; could only occasionally climb ramp/stairs, kneel, crouch and crawl: and could frequently balance and stoop.
>
> 6. Through the date last insured, the claimant was capable of performing past relevant work as a systems analyst and managing auto sales. This work did not require the performance of work-related activities precluded by the claimant's RFC (20 CFR 404.1565).
>
> 7. The claimant was not under a disability, as defined in the Social Security Act, at any time from April 1, 2004, the alleged onset date, through December 31, 2004, the date last insured (20 CFR 404.1520(f)).

(Tr. 46-58.)

After the Appeals Council denied the Plaintiff's request for review (Tr. 1-3), the ALJ's decision became the Commissioner's final decision for purposes of judicial review under 42 U.S.C. Section 405(g). See 20 C.F.R. § 404.981. The Plaintiff filed the instant action on June 22, 2010. In his brief, the Plaintiff raises the following issues:

> 1) The ALJ erred in his determination regarding the the Plaintiff's treating physicians' opinions.
>
> 2) The ALJ erred in failing to perform a function by function assessment.
>
> 3) The ALJ erred in his credibility determination.

(Pl's Brief at 2.)

The Commissioner contends that the ALJ did not commit any error and urges that substantial evidence supports the determination that the Plaintiff was not disabled. Under the Act, 42 U.S.C. Section 405(g), this Court's scope of review of the Commissioner's final decision is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether he applied the correct law. Richardson v. Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). "Substantial evidence" is that evidence which "'a reasonable mind might accept as adequate to support a conclusion.'" Richardson, 402 U.S. at 401 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's narrow scope of review does not encompass a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. See 20 C.F.R. § 404.1520. An ALJ must consider whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the claimant has an impairment which equals a condition contained in the Act's listing of impairments (codified at 20 C.F.R. Part 404, Subpart P, Appendix 1); (4) the claimant has an impairment which prevents past relevant work; and (5) the claimant's impairments prevent her from any substantial gainful employment. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a)(4); Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and if proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

Under 42 U.S.C. Section 423(d)(5), the Plaintiff has the burden of proving disability, which is defined by Section 423(d)(1)(A) as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See also 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

## II.  FACTUAL BACKGROUND

The Plaintiff was born on February 14, 1945, and was 59 years of age on the date of the alleged onset of disability, April 1, 2004. (Tr. 9.) The Plaintiff has a two year associate degree in electrical technology and past work as a systems analyst, restaurant manager, and auto sales manager. (Tr. 9, 32.)

4

The Plaintiff alleges disability due to cardiac problems, obesity, degenerative joint disease of the knees, right hemidiaphragm paralysis, chronic COPD, diabetes, hypertension, hyperlipidemia, and left ankle pain. (Tr. 46.) The medical records were set out in detail by the ALJ and in the parties' briefs. Therefore, the medical reports/records will not be repeated herein.

### III. ARGUMENTS AND ANALYSIS

**A. Treating Physicians' Opinions**

The Plaintiff contends that the opinions and treatment records of his two primary treating physicians, Drs. Alam and Murray, support a finding of disability and that the ALJ erred in failing to give controlling weight to the opinions of Drs. Alam and Murray. (Tr. 53-54, 58.)

The opinion of a physician will be given controlling weight if it is supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d) (1997); Craig v. Chater, 76 F.3d 585, 589 (4th Cir.1996) (holding that although not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it.); Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983) (holding a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.").

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). Specifically, pursuant to 20 C.F.R. § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must then consider the weight to be given to the physician's opinion by applying the

following five factors: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 30 C.F.R. 404.1527(d)(2) (i-ii) and (d)(3)-(5).

Furthermore, Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir.1974).

**i. Dr. Alam**

Dr. Alam has expressed his opinion as to the Plaintiff's disability on three occasions.  First,

on January 23, 2007, Dr. Alam wrote:

> [The Plaintiff] has been following up at our practice since last 4
> years.  He has significant medical problems including paroxysmal
> atrial fibrillation and  COPD with obstructive sleep apnea.  Wears a
> CPAP machine.  He also has a  paralyzed right hemidiaphragm.  He
> has chronic congestive heart failure, at  present compensated with
> underlying coronary artery disease.  Patient has  significant low back
> pain with multiple level HNP, radiculopathy, and  neurapraxia.  He
> has had right knee joint replacement with recurrent effusion and left
> knee end-stage OA, thus contemplating joint replacement.  Patient
> has  poor level of effort tolerance due to his COPD, chronic
> congestive heart failure, cardiomegaly, and cardiomyopathy.  He is
> unable to do any meaningful employment and I have asked him to
> apply for disability.

(Tr. 366.)

On December 23, 2008, Dr. Alam then wrote:

> [The Plaintiff] has been our patient at our office for last six to seven
> years.  Has been treated for his medical condition.  Unfortunately, his
> medical condition has far advanced and had been advised to stop
> working and apply for disability, which he has been unable to get.  In
> the interim, he started working back again and decompensated
> significantly and had to have very close follow ups and treatment.
> His medical conditions include hypertensive cardiomyopathy with
> chronic congestive heart failure, which is uncompensated.  He also
> has chronic atrial fibrillation, on Coumadin therapy.  Due to his
> significant heart failure, morbid obesity, he is unable to ambulate and
> has been gaining wt and his diabetes has steadily worsened.  Also,
> has diabetic neuropathy with chronic kidney disease stage III and has
> a left renal mass, which is under surveillance.  He also has COPD
> with obstructive sleep apnea, on CPAP.  He had bilateral hearing loss
> for which he had an MRI ordered on 5/29/07, which showed small
> vessel ischemic changes of the brain, especially in the brain stem area
> with lacunar strokes.   He has been advised to continue
> anticoagulation therapy. He also has significant osteoarthritis and has
> had bilateral knee replacement in the past, which again limits his
> mobility worsened with his morbid obesity. I have specifically
> advised the patient not to work as it decompensates his medical

condition and it would threaten his life. He continues close follow up
at my office.

(Tr. 600.)

Finally on March 11, 2009, Dr. Alam wrote:

> I have several times sent letters indicating that Mr. Ed Baier has
> serious health problems. This letter is to confirm that those health
> problems have lasted, at essentially the same level of severity, from
> early 2004, when he stopped working. Since that time, he has had
> such edema that he would have had to elevate his feet for several
> hours during any 8 hour period; he would have trouble standing or
> walking for more than an hour or so because of his knee
> replacements. Work activity has been contraindicated for him during
> this entire time.

(Tr. 610.)

The ALJ gave little weight to Dr. Alam's opinions, stating:

> Dr. Alam's statements are opinions about an issue reserved to the
> Commissioner and are not entitled to controlling weight or special
> significance, but the opinions may not be ignored. Dr. Alam did not
> provide a reasonable basis for his opinions. As explained above, the
> findings made during the course of treatment at Keowee do not
> support his findings as to the claimant's need to elevate his legs. His
> opinion is inconsistent with the remainder of the evidence, including
> evidence as to the extent of limitations from his knee and
> cardiovascular impairments. He referred to claimant's congestive
> heart failure, but admitted in his January 2007 statement that this was
> compensated. He also referred to underlying coronary artery disease,
> but catheterization has shown no evidence of coronary artery disease.
> He said claimant had significant low back pain, but medical records
> show no significant complaints of back pain on or before the date last
> insured and orthopeadic exam findings do not refer to any findings
> regarding the back.
>
> In December 2008, Dr. Alam said the claimant had started working
> again and decompensated significantly, indicating a worsening of his
> impairments that occurred well after December 31, 2004. He said
> congestive heart failure was now uncompensated and that his
> diabetes had steadily worsened, with diabetic nephropathy, chronic
> kidney disease and a kidney mass, but there is no indication that these

8

> conditions adversely affected claimant on or before December 31, 2004. He referred to sleep apnea and hearing loss, both of which were not diagnosed until after the date last insured.
>
> Because of these inconsistencies, I assign little weight to his opinions (20 C.F.R. 404.15279(e) and SSR 96-5p). I note also that the opinions appear to rely in part on an assessment of impairments for which the claimant received no treatment for at that practice.

(Tr. 57.)

The Plaintiff contends that Dr. Alam's opinions should have been granted significant weight. He argues that Dr. Alam examined him on a regular basis for six to seven years, his opinions were consistent and not contradicted by other treating physicians, and as the treating provider, he had the benefit of receiving copies all the diagnostic test results and reports from the Plaintiff's other treating physicians. (Pl.'s Br. at 23.)

The Defendant contends that the ALJ did not err in his assessment of Dr. Alam's opinions. First, the Defendant argues that Dr. Alam's opinions were rendered after the date the Plaintiff was last insured. (Def.'s Br. 20-21.) Specifically, the Defendant notes that Dr. Alam's first treatment of the Plaintiff which is documented in the record occurred on December 6, 2005, almost a year after the expiration of the Plaintiff's insured status (Tr. 426-27),[1] and that Dr. Alam rendered his opinions in January 2007, December 2008, and March 2009, three to five years after expiration of the Plaintiff's insured status. (Tr. 366, 600, 610.) Further, the Defendant argues that the ALJ correctly determined that Dr. Alam's opinions were not consistent with other medical evidence. (Def.'s Br. 22.)

---

[1]The Plaintiff argues that the first record from Keowee Primary Care , the group with which Dr. Alam practices, in the record is dated August 25, 2004 and was clearly marked as a "follow-up" visit, so "obviously, there [were] treatment notes from prior to this date that [were] not included in the record" (Pl.'s Br. at 25.) However, these earlier treatment notes are not in the record.

As the Defendant states, Dr. Alam first treated the Plaintiff one year after the Plaintiff's last insured date and rendered his opinions three to five years after the Plaintiff's last insured date which would support the ALJ's decision to reject Dr. Alam's opinion.  Although medical opinions from after the date last insured may sometimes be probative to a disability determination, these medical opinions must relate back to the relevant period and offer a retrospective opinion on the past extent of an impairment.  See Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir.1987).  Furthermore, an ALJ may also discount these opinions when they are dated long after the date last insured and are inconsistent with other opinions from the relevant period.  See Johnson v. Barnhart, 434 F.3d 650, 656 (4th Cir.2005) (holding ALJs may also discount these opinions when they are dated long after the date last insured and are inconsistent with other opinions from the relevant period).

Specifically, the ALJ found that Dr. Alam's opinions regarding the Plaintiff's knee, cardiovascular, and lower back impairments were inconsistent with the rest of the medical evidence, his own treatment notes, and those of the other physicians in his practice.  (Tr. 57.)  As to the Plaintiff's cardiovascular condition, the record supports the ALJ's determination that Dr. Alam's opinions were inconsistent with the Plaintiff's medical record.  On May 19, 2004, Dr. Robert Hull evaluated the Plaintiff for atrial fibrillation.  (Tr. 241.)  He noted that the Plaintiff had an irregular heart rate and rhythm and the Plaintiff was "essentially asymptomatic."  Id.  Dr. Hull prescribed an anti-coagulation and cardioversion.  Id.   The Plaintiff was seen for a follow-up by Dr. Hull on August 23, 2004, after having undergone two cardioversions.  (Tr. 243-44.)  Dr. Hull noted that the Plaintiff had no recurrent arrthymias and  was maintaining a regular sinus rhythm.  (Tr. 244.)  On September 13, 2004, the Plaintiff was treated at Greenville Hospital for shortness of breath.  (Tr. 251.)  He underwent a stress test which showed ischemia and Dr. Aftab Awan recommended the

10

Plaintiff undergo a left heart catherization. (Tr. 252.)  The Plaintiff underwent a catherization on September 13, 2004. (Tr. 249-50.) On September 21, 2004, Dr. Zahid Ali, a cardiologist, noted that the cardiac catherization showed no coronary artery disease, and that the Plaintiff had normal coronary arteries with reduced left ventricular functioning which could be hypertension. (Tr. 199.) Dr. Ali advised the Plaintiff to lose weight, maintain a low salt diet, and exercise regularly. Id. On December 15, 2004, Dr. Hull saw the Plaintiff for another follow-up and noted that the Plaintiff had maintained a sinus rhythm. (Tr. 245.) On September 28, 2005, at another follow-up visit, Dr. Hull noted that the Plaintiff was on medication for atrial fibrillation and had not experienced any breakthrough arrhythmias or complications. (Tr. 246.)

In December 2005, Dr. Alam noted that the Plaintiff had a regular heart rate and rhythm and no rhonchi upon respiration. (Tr. 426-27.) In February 2006, he again found the Plaintiff had a regular heart rate and rhythm and reduced pedal edema from his prior visit. (Tr. 422-23.) In March 2006, Dr. Alam found the Plaintiff had a regular heart rate and rhythm. (Tr. 419-21.) In June and September 2006, Dr. Alam found the Plaintiff had a regular heart rate and rhythm and found he had atrial fibrillation with normal sinus rhythm. (Tr. 416-18.) In April and October 2007, Dr. Alam described Plaintiff's heart failure as "compensated." (Tr. 406-07, 481-82.) In December 2008 and again in March 2009, Dr. Alam found Plaintiff had a regular heart rate and rhythm. (Tr. 616-17, 620.)

As to the Plaintiff's knee impairment, the record also supports the ALJ's determination that Dr. Alam's opinions were inconsistent with the Plaintiff's medical record. On March 28, 2005, Dr. Murray found the Plaintiff had only mild knee effusion bilaterally with some varus alignment, mild pain along the medial joint line, no lateral tenderness, and mild patellofemoral crepitus. He said the

Plaintiff would eventually need a knee replacement.  (Tr. 454.)  On May 18, 2005, Dr. Murray noted

that the Plaintiff had mild knee effusion, full hip and knee ranges of motion, mild patellofemoral

crepitus, intact musculature, normal sensation, reciprocal gait, and no peripheral swelling, varicose

veins, or rashes in the lower extremity.  (Tr. 453 ). In June 2005, Dr. Murray found the Plaintiff had

minimal knee effusion, baseline range of motion, and no instability.  (Tr. 449-50.)  On September

2, 2005, which was after the Plaintiff had undergone knee replacement surgery, Dr. Murray found

the Plaintiff had a range of motion from 0 to 120 degrees, his patella tracked well, no instability,

some baseline peripheral swelling, intact neurovascular functioning, and x-rays showed stable

alignment of the right knee.  (Tr. 447.) On  June 7, 2006, Dr. Murray noted the Plaintiff had lost

weight, was exercising more, and had less peripheral swelling. He had noted that the Plaintiff had

only mild knee effusion without erythema, near full range of motion in his knees, and his patella

tracked well. Dr. Murray also noted that the Plaintiff's x-rays of the right knee showed stable

prosthesis in good alignment and the Plaintiff did not require additional treatment at that time. (Tr.

444.)

As for the Plaintiff's lower back condition, the medical records from April 1, 2004, the

Plaintiff's alleged onset date through December 31, 2004, the date he was last insured for DIB, do

not contain any objective medical findings regarding his back which would support Dr Alam's

opinions. (Tr. 193-97, 199-200, 202-03, 228, 241-45, 249-52, 340, 343-45, 348-49.)

Here, the ALJ correctly gave little weight to Dr. Alam's opinions because the Plaintiff's

medical records did not support Dr. Alam's opinions. (Tr. 57-58.)    As set forth above, the

undersigned finds substantial evidence supports the ALJ's decision to give little weight to Dr.

Alam's opinions.  See Koonce v. Apfel, 166 F.3d 1209 (4th Cir. 1999) ("An ALJ's determination

as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion.") (internal citations and quotations omitted).

### ii. Dr. Murray

Dr. Murray is the orthopedic specialist who performed both of the Plaintiff's knee replacement surgeries. In August 2007, Dr. Murray opined that the Plaintiff could not perform even sedentary work on a sustained basis, i.e., eight hours per day, five days per week. He said the Plaintiff could not stand and walk for more than a few minutes during a work day and his limitations existed on or before December 31, 2004. (Tr. 477-78.) These opinions were based on the diagnosis of bilateral knee osteoarthritis. Id. Dr. Murray opined that the Plaintiff had severe osteoarthritis with severe pain limiting his activities and he indicated that the Plaintiff's limitations as set out above were present on or before December 31, 2004, and would have continued to the current time. Id

The ALJ found Dr. Murray's opinion was not supported by medically acceptable clinical and laboratory diagnostic techniques and he noted that the Plaintiff's knees have been stable since surgery. (Tr. 54.) The ALJ also found Dr. Murray's opinion inconsistent with the Plaintiff's testimony. Id. The ALJ declined to give it controlling weight stating:

> According to SSR 96-5p, the opinion of claimant's treating physician, Dr. Murray, that claimant cannot do even sedentary work is entitled to controlling weight *if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.* However, I cannot assign controlling weight to his opinion, as it meets neither of the criteria of SSR 96-5p. His conclusion is not well supported by the medically accepted clinical and laboratory diagnostic techniques. X-

13

ray findings and Dr. Murray's own exam findings show that both knees have been stable since surgery. His conclusion is also inconsistent with other substantial evidence, including claimant's testimony as to subjective symptoms and activities of daily living, as discussed below.

(Tr. 53-55)(emphasis in original).

The Plaintiff contends that the ALJ failed to identify with what evidence Dr. Murray's opinion was inconsistent. Further, he argues it is consistent with Dr. Alam's opinions. As with Dr. Alam, the Defendant argues that the first treatment of the Plaintiff by Dr. Murray documented in the record was March 28, 2005, almost four months after the date the Plaintiff was last insured for DIB. The Defendant also contends that Dr. Murray's opinion was inconsistent with his own treatment records and with the other medical evidence in the record.

The medical records show that on February 28, 2003, x-rays of the Plaintiff's knees taken at Mountainview Medical Imaging showed bilateral degenerative arthritic change with mild varus angulation due to bilateral medial compartment joint space loss and osteophytes. (Tr. 402.) On that initial visit, Dr. Murray noted that the Plaintiff was seen by Dr. Mendes in January 2004 for osteoarthritis of both knees and had been having severe pain since that time. Dr. Mendes diagnosed bilateral knee osteoarthritis and he opined that the Plaintiff was going to eventually need total knee replacements. (Tr. 188-189.) Dr. Murray tried conservative treatment first, giving the Plaintiff several cortisone injections. (Tr. 449-454.) On July 21, 2005, the Plaintiff underwent right knee replacement surgery. (Tr. 317.) As set out more specifically above, on various post-operative visits, Dr. Murray noted that the Plaintiff's knees were stable following surgery. (Tr. 444-454.)

Here, again the ALJ correctly did not give controlling weight to Dr. Murray opinion because he found the Plaintiff's medical records did not support Dr. Murray's opinion. As set forth above,

substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Murray's opinion. See Koonce, 166 F.3d 1209 ("An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion.") (internal citations and quotations omitted).[2]

**B.  Residual Functional Capacity**

The Plaintiff argues the ALJ failed to perform the function-by-function assessment for his residual functional capacity ("RFC") as required by SSR 96-8p.  Specifically, the Plaintiff argues the ALJ failed to fully address his ability to lift, sit, walk, and stand. (Pl.'s Br. 1, 29.)  Additionally, the Plaintiff contends the ALJ erred in finding that the Plaintiff had no evidence of any functional limitation from his cardiomegaly, right hemidiaphragm paralysis, and chronic obstructive pulmonary disease despite the ALJ's finding that these conditions were part of a severe combination of impairments.

The Social Security Regulations define RFC as "what [a claimant] can still do despite his limitations."  20 C.F.R. § 404.1545(a).  The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).  If the ALJ finds that a claimant cannot return to his prior work, the burden of proof shifts to the Commissioner

---

[2]The Defendant sets forth numerous references to the Plaintiff's medical records in support of the ALJ's determination. The Defendant, however, contrary to the Plaintiff's argument,  has not engaged in post hoc reasoning to support the ALJ's decision; rather, he has meticulously recited the details of the substantial evidence from the record that support the ALJ's determination to discredit Drs. Alam and Murray's opinions.  Dean v. Astrue,  2008 WL 373624 * 2 (D.S.C. 2008).

to establish that the claimant could perform other work, considering the claimant's RFC, age, education, and past work experience.

The ALJ found that the Plaintiff could perform sedentary work except that he could never climb ropes, ladders, and scaffolds; could only occasionally climb ramps, stairs, kneel, crouch, and crawl; and could frequently balance and stoop. (Tr. 53-58.)  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." SSR 83-10, 1983 WL 31251. Also implicit in limiting a claimant to sedentary work is a finding that the claimant could stand or walk for no more than two hours in an eight-hour workday and sit for approximately six hours in an eight-hour workday. Id.

The Plaintiff argues the ALJ's RFC assessment did not include any limitations for his cardiomegaly, right hemidiaphragm paralysis, and COPD. (Pl.'s Br. at 29).  However, the Plaintiff has not pointed to any medical evidence that these conditions caused him any additional limitations than found by the ALJ. See Choate v. Barnhart, 457 F.3d 865, 870 (8th Cir.2006) (holding that the ALJ was permitted to disregard a treating physician's opinion regarding plaintiff's limitations, when no limitations were stated in the physician's treatment notes). The ALJ properly evaluated the RFC and only included those limitations which he found to be credible and supported by the evidence in the record. The ALJ was not, therefore, required to include any limitations in the RFC that were not supported. The records provide substantial evidence to support the RFC found by the ALJ.

## C. The Plaintiff's Credibility

The Plaintiff also contends that the ALJ improperly evaluated the credibility of his subjective complaints. (Pl.'s Br. at 1, 29-35.)  The undersigned disagrees.

16

The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir.1985).

> It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96–7p.

Under Craig v. Chater, 76 F.3d 585, 591-96 (4th Cir.1996), subjective complaints are evaluated in two steps. First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Not until such underlying impairment is deemed established does the fact finder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints. See also 20 C.F.R. § 404.1529(b); Social Security Ruling (SSR) 96-7p.

The ALJ may choose to reject a claimant's testimony regarding his pain or physical condition, but he must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. Hatcher v. Sec'y, Dep't of Health & Human Servs., 898 F.2d 21, 23 (4th Cir.1989) (quoting Smith v. Schweiker, 719 F.2d 723, 725 n. 2 (4th Cir.1984)). "The

17

determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

Regarding the Plaintiff's credibility, the ALJ made these findings:

> Evidence regarding daily activities includes claimant's testimony that he drives to his doctor an average of two to three times a month for a distance of 70 miles each way. He drove himself to the hearing.
>
> I asked claimant about his response to Dr. Mendes in January 2004 when Dr. Mendes discussed the option of right total knee replacement and claimant told him he had a busy schedule with the Shrine circus and would like to consider surgery later in the spring, but did not have it until 2007.
>
> Claimant testified that he went to various Shriners' units and clubs to attend meetings, but could not do anything physical. He felt he had an obligation to go to these activities. He admitted that he was involved in charitable activities including the circus committee and raising money. He did sit-down work collect (sic) tickets to give away a bicycle. He alleged he did very short stints of activity for about an hour. He alleged that he did not get out of the house then except to go to shrine meetings , but I pointed out his statement to Dr. Elam in December 2005 that he had gone to new York to see his father (Exhibit 23F, page 24). I believe the claimant minimized his daily activities throughout his testimony and his allegations of severe symptoms and incapacitation were not credible through the date last insured.
>
> In 2002 he rode a motorcycle and took trips to Maine.
>
> The claimant has described daily living activities through the date last insured which were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.
>
> Considering the evidence as a whole, including evidence from prior to the hearing, I find claimant was not as limited in activities of daily living as he alleged in testimony. Therefore, I find he engaged in a

range of daily activities consistent with a capacity for sedentary exertion with the additional limitations set forth above.

Evidence regarding the location, duration, frequency and intensity of pain or other symptoms and precipitating and aggravating factors also includes claimant's testimony that his worst problem is breathing with exertion and it occurs even if he speak (sic) for a long time. He alleged that his right leg swells and he takes Lasix and puts his feet in the air for an hour at a time. He takes naps a couple of times a day. He alleged that during the day he spends a total of up to three hours with his legs propped.

He alleged having had narcolepsy since he was a teenager. If he drives for any period of time and feels it coming on, he will pull over and sleep. However, I find no reference to a diagnosis of narcolepsy in the record and again note that sleep apnea was not diagnosed until 2006.

As to treatment of subjective symptoms, I note that other than the knee surgeries, both of which took place after the date last insured, and the successful cardioversion procedure in 2004, claimant has had only conservative treatment. He (sic) that medications he takes for pain makes him "woozy," but in medical reports, there are few references to side effects of medications and he continues to drive in spite of this. He testified he did not use a cane, walker, or other assistive device during 2004.

He has not been fully compliant with treatment recommendations and has failed to follow-up on recommendations for weight loss and diet modification made by treating physicians. This suggests that the symptoms have not been as severe as claimant alleged in connection with his disability application.

Although the claimant has received treatment for the allegedly disabling symptoms, the record also shows that the treatment has been generally successful in controlling these symptoms.

The claimant underwent surgery for knee symptoms, but the surgery was generally successful in relieving the symptoms and Dr. Murray found his knees were stable.

Taken together, this evidence shows that through December 31, 2004, claimant's pain and subjective symptoms were of mild to moderate severity, were responsive to conservative treatment and were not

sever enough to restrict him from performing sedentary work with the additional limitations set forth above.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above RFC assessment.

In terms of the claimant's alleged leg swelling and his alleged need to elevate his legs, I note that in October 2004, he first complained of pedal edema to Dr. Husain, but by December 2004, he admitted that this was much better and Dr. Husain made no reference to pedal edema in exam findings then or in January 2005, March 2005 or June 2005. There was no finding of edema again until December 2005, a full year after the date last insured. In recent medical reports from late 2008 and 2009, there were findings of edema. However, in none of the reports from Keowee Internal Medicine or from any other source has there been a recommendation that the claimant elevate his legs during the day as he currently alleges he has to do.

(Tr. 55-56, exhibit designations omitted.)

Here, the ALJ found the Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible. The ALJ also found, the Plaintiff's activities of daily living were inconsistent with his subjective complaints of disabling functional limitations prior to the date he was last insured for DIB. (Tr. 55.)

Substantial evidence supports the ALJ's finding that the medical evidence prior to the expiration of Plaintiff's insured status did not support the Plaintiff's allegations. The ALJ noted that the Plaintiff told Dr. Mendes in January 2004, that he had a busy schedule and would like to delay knee surgery until later. (Tr. 55.) The ALJ also noted that the Plaintiff had undergone only conservative treatment for his allegedly disabling symptoms. (Tr. 55-56.) Furthermore, the ALJ

noted that the successful treatment of the Plaintiff's conditions  prior to the date he was last insured for DIB also undermined his subjective complaints. (Tr. 56.)    After Plaintiff underwent cardioversion in June 2004, the medical records show no recurrent arrhythmias. (Tr. 244.)  When the Plaintiff experienced bilateral extremity edema  in October 2004, Dr. Husain prescribed Lisinopril and Lasix and in December 2004, Dr. Husain noted the Plaintiff's pedal edema was better (Tr. 193-194.).  The ALJ appropriately considered that the Plaintiff had undergone conservative treatment and the success of his later treatments in determining the Plaintiff's credibility. See Gross, 785 F.2d at 1166 (noting if a symptom can be reasonably controlled by medication or treatment, it is not disabling).

Additionally, the Plaintiff testified that his impairments required him to elevate his legs for several hours per day.  (Tr. 21-23.)   However, while the record does show that the Plaintiff complained of edema in October 2004, (Tr. 194), none of the Plaintiff's physicians ever recommended that he elevate his legs in any of their treatment records prior to the expiration of his insured status.   Furthermore, as noted above, the record also shows that in December 2004, the Plaintiff's edema had improved.  (Tr. 193, 197, 245.)  The medical records dated from the Plaintiff's alleged onset date through the date he was last insured for DIB did not contain any need for him to elevate his legs during the day.  See Lee v. Sullivan, 945 F.2d  687, 692 (4th Cir. 1991) (finding claimant's allegation that he had to recline or lie down several times a day was properly discounted because no physician suggested that the claimant's condition required such reclining.).

The ALJ also noted that the Plaintiff testified that he had narcolepsy since he was a teenager, but none of the medical records referenced narcolepsy.  (Tr. 20-21.)  Likewise, the ALJ noted that

21

the Plaintiff testified that his medications make him drowsy, but none of the medical records contain any notation to complaints of any such side effect from any medications. (Tr. 24-25.)

The ALJ's credibility finding was grounded in part on the lack of evidence available with respect to the Plaintiff's condition during the critical period prior to his date last insured. As the ALJ found, the objective medical evidence prior to expiration of the Plaintiff's date last insured showed he only underwent conservative treatment for his impairments, or his symptoms were controlled with medications. Because the record contains substantial evidence supporting the ALJ's conclusion about Plaintiff's pain levels before his date last insured, the ALJ's credibility determinations are entitled to deference. See Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir.1997). Based on this record, the court finds no reason to disturb the ALJ's credibility assessment. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

### IV. CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. Richardson, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. Blalock, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, 739 F.2d at 989. As previously discussed, despite the Plaintiff's claims, he has failed to show that the Commissioner's decision was not based on substantial evidence. Based

upon the foregoing, this Court recommends that the Commissioner's decision be AFFIRMED.

Respectfully Submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 25, 2011
Florence, South Carolina