IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Edward William Baier, ) | |
| ) | C/A No.: 4:10-1599-MBS |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Michael J. Astrue, Commissioner of ) | **O R D E R** |
| Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

    This is an action brought pursuant to Section 205(g) of the Social Security Act (the "Act"), codified as amended at 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner").

## I. PROCEDURAL HISTORY

    Plaintiff Edward William Baier alleges that he has been disabled since April 1, 2004, because of cardiomegaly, obesity, degenerative joint disease of the knees, right hemidiaphragm paralysis, chronic obstructive pulmonary disease (COPD), diabetes, hypertension, hyperlipidemia, and left ankle pain. Plaintiff last met the insured status requirements of the Act on December 31, 2004.[1]

    Plaintiff filed an application for a period of disability and disability insurance benefits on January 31, 2007. His application was denied initially and upon reconsideration. Plaintiff requested a hearing before an administrative law judge ("ALJ"). The ALJ held a hearing on April 10, 2009. On July 17, 2009, the ALJ issued a decision that Plaintiff was not disabled under sections 216(i) and 223(d) of the Act through December 31, 2004, the last date insured. The decision of the ALJ became

---

[1] To qualify for disability benefits, Plaintiff must prove that he became disabled prior to the expiration of his insured status. See 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a)(2005)

the "final decision" of the Commissioner on May 26, 2010, after the Appeals Council determined that there was no basis for granting Plaintiff's request for review. Plaintiff thereafter brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the "final decision" of the Commissioner.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Thomas E. Rogers, III for a Report and Recommendation. On July 25, 2011, the Magistrate Judge filed a Report and Recommendation in which he recommended that the Commissioner's decision to deny benefits be affirmed. Plaintiff filed objections to the Report and Recommendation on August 11, 2011, to which the Commissioner filed a reply on August 24, 2011.

This matter now is before the court for review of the Magistrate Judge's Report and Recommendation. The court is charged with making a de novo determination of any portions of the Report of the Magistrate Judge to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b).

## II. STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes a de novo review of the factual circumstances that substitutes the court's findings for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971).

2

The court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the [Commissioner's] findings, and that his conclusion is rational." *Vitek*, 438 F.2d at 1157-58.

The Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). However, the Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

### III.  DISCUSSION

A.     Plaintiff's Testimony

Plaintiff testified at his hearing before the ALJ that he was sixty-four years old. R. 9. He possesses an associate degree in electrical technology. *Id.* Plaintiff has past relevant work experience as an insurance agent, restaurant manager, general manager at an automotive facility, and business process systems analyst with IBM. *Id.* at 14-17.

Plaintiff testified that he has a problem with breathing on any exertion, even speaking for a long period of time. *Id.* at 20. Plaintiff testified that he has a paralyzed diaphragm, so that only one lung functions. *Id.* He testified that his right leg swells because of his congestive heart failure and that he is required to elevate his leg several times a day. *Id.* at 20-21. Plaintiff testified that he has

3

had narcolepsy since he was a teenager, and that he gets so tired that he cannot keep his eyes open. *Id.* at 21. Plaintiff testified that he occasionally uses an edema cuff. *Id.* at 22. According to Plaintiff, in 2004 his knees were bad and he was in excruciating pain. *Id.* at 24.

Plaintiff testified that in 2004 he was engaged in no outdoor activities or hobbies, such as fishing or hunting. *Id.* at 26. However, he belonged to the Shriners and would attend meetings and participate in Shriners charitable activities. Plaintiff was on the circus committee. *Id.* at 27. Plaintiff testified that he collected tickets but could not do anything physical. *Id.* at 26-27. According to Plaintiff, he put off knee surgery during this time because he felt obligated to attend the circus committee. *Id.* at 27. Plaintiff testified that he injured his ankle in a motorcycle accident in August 2002, but has not ridden his motorcycle since 2002. *Id.* at 29. Plaintiff testified that he did not use a cane or walker to get around in 2004 because he did not leave the house except to go to a Shriners meeting. *Id.* at 30. He would park close to the door of the building and would find a place to sit as soon as he entered the meeting room. *Id.*

B.    Medical Records

The medical records reveal that Plaintiff was seen by Stephen A. Bloomingdale, M.D. from August 6, 1991 to May 15, 2001. R. 158. Plaintiff reported a herniated disc and pain in his knees that was alleviated by stretching. He reported diabetes; frequent numbness; occasional arthritis, bursitis, low back pain, neck pain and stiffness, and pain between the shoulders; occasional pain or numbness in the shoulders and arms; frequent pain or numbness in the hands, hips, and legs; frequent to constant pain his knees; occasional swollen joints; occasional high blood pressure; constant poor circulation; deafness and nearsightedness. R. 163.

An MRI of the lumbar spine taken on August 13, 1991 for Randy Ferrance, D.C. indicated

evidence of significant disc degeneration at L5-S1, as well as evidence of disc herniation toward the left at L4-L5. On August 30, 1991, Dr. Ferrance recommended that Plaintiff return to work with the following restrictions: lifting with a limit of 10-20 pounds; standing/walking with a daily limit of 4-6 hours; sitting with a daily limit of 4-6 hours with breaks; avoiding repetition motions in bending, squatting, climbing, twisting, carrying, stooping, pushing, pulling, and kneeling; and a final restriction that he be able to change positions often and not sit for more than forty-five minutes at a time. R. 181-82.

Plaintiff was seen by Gilbert L. Hyde, M.D. on June 14, 2002, complaining of right shoulder pain the previous Sunday. His family doctor provided him with Bestra and put his arm in a sling. Plaintiff was nearly completely better by the time of his visit. R. 456. Dr. Hyde also saw Plaintiff on August 22, 2002 after Plaintiff was involved in a motorcycle accident on June 9, 2002. Dr. Hyde noted no swelling, no point tenderness, and no effusion or erythema around either foot or ankle. X-rays of both ankles and feet showed no osseous abnormalities. R. 455.

Plaintiff was referred to Michael W. Mendes, M.D. on January 1, 2004. Plaintiff complained of right knee pain, pain in the lateral aspect of the left ankle, and pain in the left knee, although not as severe as in the right knee. Dr. Mendes noted that Plaintiff was 5' 9" and weighed 280 pounds. He walked without a limp or list. Dr. Mendes noted moderate-to-severe bilateral varus deformity, palpable medial ostephytes bilaterally, and moderate crepitance. Range of motion on the right knee was from 5 degrees to 105 degrees by goniometer, and 1 degree to 100 degrees on the left knee. Three radiograph views of he left ankle demonstrated mild degenerative changes. Each knee demonstrated endstage complete loss of the medial compartment joint space, enlarged lateral osteophytes, and large patellofemoral osteophytes consistent with tricompartmental disease. Dr.

Mendes discussed with Plaintiff the option of right total knee replacement. Plaintiff indicated that he had a busy schedule with the Shrine circus and would like to consider surgery later in the spring. Plaintiff was to return to Dr. Mendes in late April or May for consideration of scheduling. R. 188-89.

Plaintiff was seen by Arshad Husain, M.D. on August 25, 2004, reporting that he has been feeling short of breath off and on. Plaintiff denied any chest pain, palpitations, diaphoresis, syncope or pre-syncope, diarrhea, or dysuria. An EKG was done that showed normal sinus rhythm with left axis deviation. Dr. Husain noted no acute ischemic changes. Dr. Husain further noted noninsulin-dependent diabetes mellitus (NIDDM); hypertension; paroxysmal atrial fibrillation; bilateral severe osteoarthritis of both knees; mild hyperlipidemia, diet controlled; and left anterior hemiblock (LAHB). Plaintiff's baseline pulmonary function tests were normal. R. 196.

Raza Hassan, M.D. administered a stress cardiolite test on September 2, 2004. SPECT cardiolite images revealed evidence of a dilated cardiomyopathy and inferior perfusion defect which could represent mild ischemia. R. 203. The exercise portion of the stress test was stopped after Plaintiff got short of breath and tired. Plaintiff achieved almost 80 percent of the target heart rate. Plaintiff complained of shortness of breath starting at the second minute. However, there was no chest pain, diaphoresis, dizziness, and no precipitant drop in blood pressure and the EKG did not show any ischemic changes or arrhythmia. R. 200.

Plaintiff was seen by Aftab Awan, M.D. on September 13, 2004. Dr. Awan noted Plaintiff's past medical history significant for hypertension, diabetes mellitus, hyperlipidemia that is diet-controlled, and osteoarthritis along with paroxysmal atrial fibrillation. Dr. Awan noted that Plaintiff had been cardioverted twice in the past and was on Coumadin. Plaintiff agreed to undergo a left heart catheterization. R. 252.

Plaintiff underwent a cardiac catheterization on September 13, 2004. The catheterization demonstrated no coronary artery disease; however, on September 21, 2004 Zahid Ali, M.D. noted left ventricular ejection fraction of about 45 percent. Plaintiff denied any chest pain or shortness of breath. Dr. Ali advised Plaintiff to continue his ACE inhibitor and diuretic; maintain a low salt, low cholesterol diet; lose weight; and exercise regularly. R. 199.

On October 1, 2004, Blake C. Poleynard, M.D. reviewed x-rays of Plaintiff's chest and noted frontal and lateral views show kyphosus with degenerative end plate change in the dorsal spine. Dr. Poleynard note mild tortuosity of the dorsal aorta, and mildly enlarged cardiac silhouette. He diagnosed mild cardiomegaly. R. 202.

Plaintiff presented to Dr. Husain on November 26, 2004, complaining of shortness of breath. Dr. Husain noted that Plaintiff had developed +3 pedal edema bilaterally. Plaintiff also reported that he underwent cardiac cautherization, which revealed normal coronary arteries. Dr. Husain noted that Plaintiff had mild cardiomegaly related to mild hypertensive cardiomyopathy. Plaintiff denied any chest pain, palpitations, diaphoresis, syncope, diarrhea, or dysuria. Dr. Hussain reported noninsulin-dependent diabetes mellitus (NIDDM), hypertension, congestive heart failure, paroxysmal atrial fibrillation, osteoarthritis of both knees, mild hyperlipidemia, and left anterior hemiblock (LAHB).

Plaintiff was seen by Dr. Husain. on December 9, 2004 for a follow up visit. Plaintiff still continued to feel short of breath. He reported that pedal edema was better. He denied chest pain, palpitations, diaphoresis, syncope, and diarrhea. Dr. Husain noted NIDDM, hypertension, congestive heart failure, paroxysmal atrial fibrillation, osteoarthritis of both knees, mild hyperlipidemia, and LAHB. R. 193.

On December 15, 2004, Plaintiff was examined by Robert W. Hull, M.D. Dr. Hull noted that Plaintiff's lung fields were clear, carotid upstrokes were brisk without bruits, there was a regular rate and rhythm, and a 2+ pretibial edema bilaterally. Dr. Hull determined that Plaintiff should continue on low-dose Amiodarone and Courmadin.

The remaining medical records reference treatment after the date last insured. The following treating physicians are of particular relevance.

1.      <u>John H. Murray, M.D.</u> Dr. Murray saw Plaintiff on March 28, 2005 with respect to complaints of pain in Plaintiff's knees. Dr. Murray noted that Plaintiff's shortness of breath had improved, there had been no recent chest pain, no numbness or paresthesias, nor history of inflammatory arthopathy or gout; and no radicular or myclopathic symptoms. Dr. Murray noted that Plaintiff had a mild knee effusion bilaterally, some varus alignment. Range of motion was 0 degrees to about 110 degrees with mild pain along the medial joint line. The knee was nontender laterally. Plaintiff showed some mild patellofemoral crepitus; no ligamentous instability; calf nontender; neurovascularly intact. Standing x-rays of the knee revealed severe medial compartment osteoarthritis as well as some patellofemoral arthrosis. Dr. Murray opined that Plaintiff would eventually need a knee replacement, and expressed concern about Plaintiff's weight, which was over 300 pounds. Dr. Murray recommended cortisone injections, Supartz series, physical therapy, and an exercise program. R. 454.

On May 18, 2005, Dr. Murray saw Plaintiff for a follow up of Plaintiff's bilateral knee pain. Plaintiff decided to proceed with the Supartz series, and Dr. Murray injected both knees with Supartz with no immediate complications. Plaintiff was advised to continue his exercise program. R. 453. Additional injections of Supartz took place on May 23, 2005, June 1, 2005, and June 8, 2005. On

June 8, 2005, Plaintiff reported some moderate pain and little relief from the Supartz series. Dr. Murray's physical examination revealed minimal knee effusion, no instability. Plaintiff decided to undergo knee replacement surgery in July 2005. R. 450-52.

On August 5, 2005, Plaintiff presented to Dr. Murray for a follow up subsequent to right total knee replacement. Plaintiff had problems with peripheral edema and increased his Lasix. X-rays showed excellent alignment of Plaintiff's prosthesis. Plaintiff was referred to a lymphedema nurse. R. 448. Plaintiff returned to Dr. Murray on September 2, 2005. Dr. Murray noted that Plaintiff was in minimal pain and that his knee replacement was stable. R. 447.

Dr. Murray saw Plaintiff again on December 9, 2005. Plaintiff reported a little peripheral swelling and that he had been treated for venous stasis disease, but his knee was doing extremely well. R. 446. Plaintiff presented for a follow-up on March 24, 2006. Plaintiff reported a bit of increased swelling, minimal pain. Dr. Murray noted moderate knee effusion, excellent range of motion, patella tracks well, no varus or valgus instability. R. 445. On June 7, 2006, Dr. Murray noted that Plaintiff's knee replacement was doing extremely well. He had been started on an inhaler, which helped his breathing tremendously. Plaintiff also had lost weight and was exercising a lot more. Plaintiff had less peripheral swelling. Dr. Murray noted that Plaintiff showed left knee osteoarthritis, which appeared stable, and that Plaintiff did not need additional treatment at that time. R. 444.

Plaintiff was examined by Dr. Murray on December 4, 2006. Plaintiff reported moderate problems with the left knee. The left knee had severe varus alignment, mild knee effusion, tenderness along the medial joint line, and was slightly tender laterally. Plaintiff indicated that he was interested in addressing the left knee possibly in the summer of 2007. R. 443. A follow-up visit with Dr. Murray on June 4, 2007 revealed a stable right knee replacement with continued

9

strengthening, and osteoarthritis of the left knee. Plaintiff reported that he was having some urologic surgery and would have to wait to undergo any surgery on his left knee. R. 442.

2.    T.S. Alam, M.D.. Dr. Alam saw Plaintiff on December 6, 2005 after Plaintiff presented to the hospital with chest discomfort and shortness of breath. Plaintiff reported feeling better. R. 426. Plaintiff presented again on December 22, 2005 worried about an abdominal injury subsequent to a motor vehicle accident. Dr. Alam diagnosed right-side abdominal ecchymosis and reassured Plaintiff. R. 425.

Plaintiff was examined by Kelly McCormick, FNP, Dr. Alam's family nurse practitioner, on February 27, 2006 for a nailbed biopsy of the right great toe due to persistent subungual discoloration to rule out subungual melanoma. Plaintiff was positive for cough and shortness of breath. He reported no chest pain, nausea, vomiting, diarrhea, dizziness, syncope, hemoptysis, melena. FNP McCormick noted dyspnea; clinical congestive heart failure; cough probably secondary to congestive heart failure; hypertension, controlled; orthopnea; pedal edema; NIDDM paroxysmal atrial fibrillation; thinning of the nail, probably related to calcium and biotin deficiency; and neck pain with right radiculopathy. R. 423.

FNP McCormick examined Plaintiff on March 9, 2006. She reported doing a CT scan of Plaintiff's chest, but she identified no abnormalities other than some granulomatous changes and some atelectasis. FNP McCormick noted moderate-to-severe obstructive and restrictive airway disease, possibly due to amiodarone; actinic keratosis; paronychia; dyspnea on exertion with negative heart cath; right knee joint effusion; and bulging cervical disc with chronic neck pain and radiculopathy. FNP McCormick noted that she was referring Plaintiff to the pain clinic for possible epidural steroid injection into his C spine, and that Plaintiff's neck pain had gotten significantly

worse for the past several weeks, and that it started after his motor vehicle collision in December 2005. R. 420-21.

Plaintiff again presented to FNP McCormick on March 22, 2006. He reported over the past three years progressively getting short of breath. FNP McCormick noted restrictive airway disease, congestive heart failure, and hypertension. She noted that she was concerned that amiodarone was the reason for his progressive shortness of breath, and if confirmed by Dr. Chandran or Mansoor, would refer Plaintiff back to Dr. Hall. R. 419.

Plaintiff was seen by Dr. Alam on June 27, 2006 and September 28, 2006. On September 28, 2006, Dr. Alam noted that Plaintiff had lost a significant amount of weight. Plaintiff complained of increased daytime hypersomnolence, fatigue, tiredness, and an inability to stand on his legs for extended periods of time. Plaintiff reported that he had to pace himself to work and that he had been finding it more and more difficult to do extraordinary activities. Dr. Alam noted that he would send Plaintiff for a sleep study and see Plaintiff back in three or four months. Dr. Alam noted that at that point he and Plaintiff would decide about Plaintiff's disability depending on Plaintiff's sleep study, stress Cardiolite, cardiomyopathy, and COPD. R. 416-18.

Dr. Alam noted on November 21, 2006 that Plaintiff had taken an exercise stress test that had to be stopped due to significant shortness of breath, wheezing, and Plaintiff unable to keep up with the treadmill. Plaintiff did not achieve the target heart rate, but there were no indications of ischemia at this level of stress. R. 414.

Plaintiff was examined by Dr. Alam on April 30, 2007. Plaintiff reported he was doing well and had gained some weight. His legs had been swelling. Plaintiff exhibited mild pedal edema. Dr. Alam noted that Plaintiff had been turned down for SSI. Dr. Alam strongly advised diet control,

weight loss, and no salt. R. 406-07.

\* \* \*

Dale Van Slooten performed a Physical Residual Functional Capacity Assessment on March 20, 2007. Dr. Slooten determined that Plaintiff could occasionally life and/or carry 20 pounds; frequently life and/or carry 10 pounds; stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday; and have no restrictions as to push and/or pulling. Dr. Slooten found that Plaintiff could occasionally climb ramp/stairs; never climb ladder/rope/scaffolds; frequently balance and stoop; and occasionally kneel, crouch, and crawl. Dr. Slooten opined that the evidence supported light work. R. 379-86.

On January 23, 2007, Dr. Alam provided a statement in support of Plaintiff's disability, as follows:

> Baier has been following up at our practice since last 4 years. He has significant medical problems including paroxysmal atrial fibrillation and COPD with obstructive sleep apnea. Wears a CPAP machine. He also has a paralyzed right hemidiaphragm. He has chronic congestive heart failure, at present compensated with underlying coronary artery disease. Patient has significant low back pain with multiple level HNP, radiculopathy, and neurapraxia. He has had right knee joint replacement with recurrent effusion and left knee end-stage OA, thus contemplating joint replacement. Patient has poor level of effort tolerance due to his COPD, chronic congestive heart failure, cardiomegaly, and cardiomyopathy. He is unable to do any meaningful employment and I have asked him to apply for disability.

R. 366.

On August 29, 2007, Dr. Murray completed a questionnaire in which he opined that Plaintiff could not perform sedentary work and that he could not stand and walk, in combination, for more than a few minutes during the work day. Dr. Murray indicated that Plaintiff suffered from bilateral knee osteoarthritis and severe pain limiting his activities. Dr. Murray further opined that Plaintiff's

limitations would have been present on or before December 31, 2004 and would have continued to the current time. R. 477-78.

Dr. Alam prepared a letter on December 23, 2008 in which he stated that Plaintiff had been advised to stop working and apply for disability. Dr. Alam stated that Plaintiff was required to return to work and had decompensated significantly and had to have very close follow ups and treatment. Dr. Alam stated that Plaintiff's medical conditions included hypertensive cardiomyopathy with chronic congestive heart failure; morbid obesity; diabetes; diabetic nephropathy with chronic kidney disease stage III and a left renal mass; COPD with obstructive sleep apnea; a bilateral hearing loss; and osteoarthritis. Dr. Alam opined that Plaintiff should not work as it would threaten his life. R. 600.

Dr. Alam again prepared a statement on March 11, 2009 in which he opined that Plaintiff has serious health problems that have lasted at essentially the same level of severity from early 2004. According to Dr. Alam, "Since that time, he has had such edema that he would have had to elevate his feet for several hours during any 8 hour period; he would have trouble standing or walking for more than an hour or so because of his knee replacements. Work activity has been contraindicated for him during this entire time." R. 610.

C.     The ALJ's Decision

Based on this and other evidence appearing in the record, the ALJ determined that Plaintiff has the following severe impairments: cardiomegaly, obesity, degenerative joint disease of the knees, right hemidiaphragm paralysis, and COPD. The ALJ noted that Plaintiff also provided a history of NIDDM, hypertension, paroxysmal atrial fibrillation, mild hyperlipidemia, and LAHB, but that these conditions were controlled with diet, medication, and other conservative measures and did not result

in any limitation of Plaintiff's ability for basic work-related activities. R. 46. The ALJ noted that Plaintiff was diagnosed with sleep apnea and restless leg syndrome in 2006 that had been controlled with the use of a continuous positive airway pressure (CPAP) device. The ALJ also noted that a hearing loss was diagnosed in 2007. The ALJ determined that these were not severe impairments on or before December 31, 2004. *Id.* The ALJ further determined that, through the date last insured, Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(b), except Plaintiff could never climb ropes/ladders/scaffolds; could only occasionally climb ramp/stairs, kneel, crouch, and crawl; and could frequently balance and stoop. R. 53. The ALJ noted that he reduced the finding of light work set forth in the Physical Residual Functional Capacity Assessment to accommodate Plaintiff's complaints and combination of conditions, including obesity. R. 53. The ALJ noted that Plaintiff's current treating physicians, John Murray, M.D., and T.S. Alam, M.D., had both opined that Plaintiff was disabled as of the last date insured. However, the ALJ declined to give the opinion of Dr. Murray controlling weight, R. 53-54, and gave little weight to the opinion of Dr. Alam, R. 58, because the opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and were not consistent with other substantial evidence in the record. R. 54, 57.

The ALJ further determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible because Plaintiff had described daily living activities through the date last insured that were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. R. 55. The ALJ noted that there was no reference to narcolepsy in the record and that sleep apnea was not diagnosed until 2006. The ALJ further noted that Plaintiff had been treated conservatively during the time prior to the date last

insured, and that the medical records reveal few references to side effects from medication. Moreover, Plaintiff used no assistive devices during 2004. The ALJ also noted that Plaintiff had not been fully compliant with treatment recommendations and has failed to follow up on recommendations for weight loss and diet modification. R. 55-56. The ALJ further found that Plaintiff's statements regarding his limitations were not credible to the extent they were inconsistent with the Physical Residual Capacity Assessment.

The ALJ concluded that Plaintiff was capable of performing past relevant work as a systems analyst and managing auto sales as those jobs are generally performed. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined under the Act, through December 31, 2004, the date last insured. R. 58-59.

D.      The Report and Recommendation and Objections

On judicial review, Plaintiff first contended that the ALJ erred in giving little weight to the opinion of Dr. Alam and determining that he could not give controlling weight to the opinion of Dr. Murray. The Magistrate Judge found that substantial evidence supported the ALJ's determination. Plaintiff contends that the Magistrate Judge erred in ruling that the ALJ properly evaluated the opinion evidence.

Normally, the treating physician's opinion is accorded controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). If not entitled to controlling weight, the value of the opinion must be weighed and the ALJ must consider:

    (1) the physician's length of treatment of the claimant,
    (2) the physician's frequency of examination,
    (3) the nature and extent of the treatment relationship,

15

    (4) the support of the physician's opinion afforded by the medical evidence of record,
    (5) the consistency of the opinion with the record as a whole; and
    (6) the specialization of the treating physician.

20 C.F.R. § 404.1527(d)(2). Courts often accord greater weight to the testimony of a treating physician because the treating physician necessarily has examined the applicant and has a treatment relationship with the applicant. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ has the discretion, however, to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence. *Id.* at 654 n.5 (quoting *Mastro*, 270 F.3d at 178).

  As the Magistrate Judge correctly noted, substantial evidence supports the ALJ's determination that Dr. Alam's opinions regarding Plaintiff's disability at the time of the last date insured was inconsistent with the rest of the medical records, Dr. Alam's notes, and the notes of other physicians in his practice. Moreover, the Dr. Alam's assessment was submitted several years after Plaintiff's date last insured, and the record lacks objective medical evidence to support a finding that the impairments observed by Dr. Alam either existed prior to December 31, 2004, or existed to the extent found by Dr. Alam commencing in 2005. Based upon the medical records, as set forth in detail hereinabove, the court concludes that substantial evidence supports the ALJ's decision to give little weight to Dr. Alam's opinions regarding Plaintiff's alleged disability as of the date last insured.

  In addition, the court agrees with the Magistrate Judge's finding that substantial evidence supports the ALJ's decision not to accord Dr. Murray's opinion controlling weight. As the record demonstrates, Dr. Murray's medical records reflect that Plaintiff's knees were successfully treated by surgery and medically stable. Dr. Murray's own medical records are inconsistent with Dr. Murray's August 2007 opinion that Plaintiff was severely limited by osteoarthritis with severe pain,

and that such limitations existed before December 31, 2004. In addition, the medical records prior to December 31, 2004 are inconsistent with Dr. Murray's opinion. Although Plaintiff reported difficulties with his knees, he opted for conservative treatment in 2005 prior to deciding on knee replacement surgery, and suspended left knee surgery in 2007 pending another procedure. The court concludes that the record as a whole contains substantial evidence to support the ALJ's findings.

Plaintiff next argued on judicial review that the ALJ erred in failing to perform a function by function assessment for the Physical Residual Functional Capacity Assessment, specifically Plaintiff's ability to lift, sit, walk, and stand, as required by SSR 96-8p.[2] According to Plaintiff, his significant limitations in standing and walking are not consistent with the ability to perform sedentary work. The Magistrate Judge determined that implicit in a finding of sedentary work is a finding that a claimant could stand or walk for no more than two hours in an eight-hour workday and sit for approximately six hours in an eight-hour workday. Plaintiff asserts that the Magistrate Judge erred in concluding that an "implicit" finding is adequate under SSR 96-8p.

This court previously has noted authority for the proposition that "so long as the narrative opinion is sufficiency detailed and cogent on the ultimate issues for the reviewing court to follow the ALJ's logic and reasoning and supported by substantial evidence in the record, then the lack of specific findings on more subordinate issues . . . does not require reversal." *Mellon v. Astrue*, C/A No. 4:08-2110-MBS, 2009 WL 2777653, *13 (D.S.C. Aug. 31, 2009). Plaintiff's objection is without merit.

---

[2] SSR 96-p provides: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."

Finally, Plaintiff contended on judicial review that the ALJ erred in his credibility determination. The Magistrate Judge found that substantial evidence supports the ALJ's finding that the medical evidence as of Plaintiff's last date insured did not support Plaintiff's allegations. The Magistrate Judge found that substantial evidence supported the ALJ's opinion. Plaintiff contends that the Magistrate Judge erred in ruling that the ALJ properly evaluated Plaintiff's credibility.

The determination of whether a person is disabled by pain or other symptoms is a two-step process. Once a threshold determination is made that objective medical evidence shows the existence of a medical impairment which could reasonably be expected to produce the pain alleged, "'the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work, must be evaluated.'" *Thompson v. Astrue,* No. 10-2277, 2011 WL 3489671, *4 (4th Cir. August 10, 2011) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). The second step is analyzed using statements from treating and nontreating sources and from the claimant. *Id.* (citing 20 C.F.R. §§ 404.1529(a), 416.,929(a)). Factors in evaluating the claimant's statements include consistency in the claimant's statements, medical evidence, medical treatment history, and the adjudicator's observations of the claimant. *Id.* (citing SSR 96–7p).

As noted hereinabove, the ALJ found that Plaintiff's activities of daily living, at the time of Plaintiff's date last insured, were inconsistent with his subjective complaints of disabling functional limitations based upon Plaintiff's involvement with the Shriners, his determination to postpone knee surgery because he was too busy, his vacations and his motorcycle trips. The ALJ also noted that many of the complaints stated by Plaintiff were not reflected in the medical records prior to December 31, 2004. The court concludes that the record as a whole contains substantial evidence to support the ALJ's findings.

III. CONCLUSION

The court concludes that ALJ's findings are supported by specific references to the evidence upon which the ALJ bases his decision. *See See v. Washington Metro. Area Transit Auth.*, 36 F.3d 375, 384 (4th Cir. 1994). Plaintiff has not demonstrated that the evidence is insufficient for "'a reasonable mind [to] accept [the ALJ's] conclusion[s].'" *McCarney v. Apfel*, 28 F. App'x 277 (4th Cir. 2002) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Accordingly, the court adopts the Report and Recommendation and adopts it herein by reference. For the reasons stated herein and in the Report and Recommendation, the Commissioner's decision is **affirmed**.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
United States District Judge

Columbia, South Carolina

September 29, 2011.